**GENERAL DEVELOPMENT CORPORATION, Plaintiff,**

v.

**Mark P. BINSTEIN and Richard Joel, Defendants.**

Civ. A. No. 89–3820.

United States District Court, D. New Jersey.

July 30, 1990.

1116

Nicholas deB. Katzenbach, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., Joseph L. Buckley, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein and Gross, P.A., Newark, N.J., Steven M. Edwards, Davis, Markel & Edwards, Paul M. Dodyk, Cravath, Swaine & Moore, New York City, for plaintiff.

Mark P. Binstein, Oradell, N.J., Donald J. Williamson, Williamson & Rehill, Westwood, N.J., Herbert Deutsch, Deutsch and Frey, New York City, for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

On October 27, 1988, General Development Corporation ("GDC") filed this action lying in diversity in the United States District Court for the Southern District of New York against Mr. Mark P. Binstein and Richard Joel, Esq., complaining of defamation, false disparagement of product and injurious falsehood on Mr. Binstein's part, and tortious interference with contract and/or prospective economic advantage; certain violations of New York, New Jersey, Massachusetts, and Connecticut statutes prohibiting deceptive business or trade practices; and violations of these same states' statutes and ethical rules prohibiting solicitation of litigation on both defendants' parts. In its complaint, GDC requested (1) injunctive relief prohibiting the defendants from engaging in improper solicitation through false and misleading statements and requiring them to refund any and all retainers received from their clients; (2) monetary damages for the injury to GDC's business, reputation, and loss of goodwill; (3) monetary damages for the injuries to GDC's actual or prospective contractual relationships; (4) punitive damages; and (5) counsel fees and costs. On September 5, 1989, the parties consented to transfer the action to the United States District Court for the District of New Jersey. On September 15, 1989, the clerk of

the court assigned the matter to me. Before me now are a battery of motions—namely, (1) the defendants' motion for summary judgment dismissing the complaint based on the doctrines of (a) unclean hands, (b) collateral estoppel and (c) standing; (2) the defendant motion for a dismissal with prejudice under Fed.R.Civ.P. 41; (3) the plaintiff GDC's motion for a dismissal without prejudice under Fed.R.Civ.P. 41(a); (4) the defendant Binstein's motion to compel discovery; and (5) the parties' cross-motions for Rule 11 sanctions. I heard the parties argue these matters to me on June 29, 1990. It is understatement to say that the parties have had a full and fair opportunity to provide the court with evidentiary submissions and briefing in support of their respective positions. I now am prepared to render a decision.

## BACKGROUND

The background of this action is involved. GDC is a corporation incorporated in Delaware. GDC has its principal executive offices in Miami, Florida (complaint para. 4). GDC develops planned communities in Florida. It appears, from the complaint, that GDC is involved in developing communities in Port St. Lucie, Vero Beach/Vero Beach Highlands, Sebastian Highlands, Port Malabar, Port St. John, Silver Spring Shores, Julington Creek, Port LaBelle and Port Charlotte/North Port/Myakka Estates, Florida. In developing these communities, GDC purchases land, plats the land for sale, constructs roads and drainage, water, and sewer facilities, designs and builds houses, assists in the development of commercial sites, makes land available for parks and recreation areas and provides certain services, including mortgage financing, real estate agency, and property management services, and obviously sells what it develops (*see* id. para. 5). At issue in this litigation is the quality of the "North Port" subdivision in Sarasota County, Florida. Defendant Binstein organized hundreds of individuals who have bought property primarily in North Port to sue GDC based on alleged federal RICO violations, securities fraud violations, and other fraudulent acts. *See*

*Rolo v. General Development Corp.*, Civ. A. No. 89–3373(xx)(HAA). In a nutshell, the amended complaint alleged that GDC

devised false and fraudulent representations concerning, among other things, the investment value of the real estate it was peddling, the date of completion of improvements, the types of improvements that would be made, the costs of improvements, the relationship of GDC to its many subsidiaries which permitted self-dealing and multiple dipping, the role of GDC as a developer, past and current appreciation of property at North Port and other GDC subdivisions, GDC's maintenance of improvements to plaintiff's property, the willingness or ability of the City of North Port and other municipal bodies to maintain improvements in GDC developments, such as paved roads and drainage, the availability of rentals, and the demand for building lots ("homesites") in North Port and other GDC areas, the resale results and possibilities for these "homesite" lots, the number of lots GDC would plat and continue to sell (more than 200,000 platted and sold at North Port and GDC's adjoining Port Charlotte subdivision), economic and environmental restrictions and impediments to improving North Port lots and GDC's other subdivisions, the only conditions under which the City of North Port will accept or maintain lots sold by GDC in North Port, the number of lots which GDC did, can/or will improve with central water and sewers, the problems of obtaining permits for central water and sewerage and the costs of same, the flood prone conditions at GDC developments such as North Port, the availability of refunds to out of state purchasers of property at North Port, the market value of lots and their saleability [sic], the availability of improved lots to exchange, and the other facts why North Port lots and GDC's eight Florida subdivisions cannot become fully improved or marketable homesites for many, many years, if ever, and the fact that fifty-eight (58%) percent of the lot purchasers

eventually default on their contract purchases.

(Rolo Complaint para. 4). Further, the *Rolo* plaintiffs alleged that GDC

omitted the disclosure of material facts and conditions concerning GDC, North Port, GDC's eight (8) other massive Florida subdivisions, the value and demand for the lots and GDC homes and condos at North Port and its other subdivisions, the limited nature of the residential "core" or "model city" area at North Port and its other subdivisions; the marketability of lots and homes, the availability of rentals, the false inflation of home and lot appraisal values and the self-dealing between GDC and its subsidiaries from the date of initial sales through the closing to present.

(Id. para. 5). Based on these alleged misdeeds, the *Rolo* plaintiffs contended that GDC "bilked" them out of their purchase money and left them with near worthless and unmarketable lots (*see* id.).

Prefatory to the *Rolo* litigation, it appears that Mr. Binstein solicited interested individuals to sue GDC under the aegis of the "North Port Out of State Lot Owners Association" (the "Association"). It is Mr. Binstein's communications with these individuals which forms the basis for a large part of the instant litigation. In this regard, it appears from the allegations in the complaint that Mr. Binstein initially communicated with purchasers of North Port homesites who resided in New York, Connecticut, Massachusetts and New Jersey by way of a form letter. GDC attached one of the letters, specifically the one sent to New Jersey residents, as Exhibit A to its complaint.

This letter reported that the property owned by these individuals was virtually worthless as an investment and would remain unimproved despite GDC's representations or guarantees to the contrary (complaint exh. A). The letter provided "some of the many reasons" for the Association's thesis. Those reasons were that:

(1) GDC failed to pave roads and provide drainage as guaranteed and failed to maintain roads and drainage canals for certain lots;

(2) The failure to maintain articulated in number one above caused "impassable and hardly recognizable" roads and "endless flooding;"

(3) GDC "never had plans or permits to fully improve [the] lots and environmental and other restrictions at North Port [could] prevent utilities and services from ever being completed" or available to the individual lot owners;

(4) If paved roads were indeed extended to the properties, North Port would not maintain them until 80% of the lots were improved. According to the Association, this meant that at the past and current growth rate "and building demand at Port Charlotte and North Port, *we will have no roads accepted or maintained for more than 300 years.*" "One reason for this outrageous fact is that North Port is quite low and wet land and unsuitable for intensive development because of potential for flooding and its need for extensive drainage;"

(5) GDC "at North Port and Port Charlotte platted and sold approximately 200,000 lots and, at the past and current rate of growth and demand for building lots there, *it would take at least 300 years for our lots to become fully improved or marketable* as those in tiny 'core' area;"

(6) "In more than 20 years, [GDC] improved less than 10% of lots sold at North Port and Port Charlotte with central water and sewers;"

(7) "The platting and selling of lots by GDC at North Port was not phased to coincide with any expected rate of occupancy, and [GDC's] policy of selling lots to tens of thousands of persons for investment, with no intent to build was the surest way to guarantee that overwhelming majority of lots would remain unimproved and have little or no resale value for centuries, if ever;"

(8) "While [GDC] represented that lots it was selling at North Port and eight other subdivision [sic] were excellent investments that did and would continue to appreciate in market value, the over-

whelming majority of lot purchasers cannot resell their lots at virtually any price. Therefore, *even if ever improved,* it will be more than 300 years (at past and current rates of growth and demand for building lots at North Port) until our lots become marketable;"

(9) "While [GDC] guaranteed in written contracts that we could obtain full refunds if certain improvements (such as paved roads) were not completed by specific past dates, [GDC] refuses to make such refunds for varying reasons that have no merit and are devised to compel lot purchasers to file actions that could be probitively [sic] expensive to most lot purchasers;"

(10) "One sham reason [GDC] gives for refusing to provide full refunds for failing to make improvements by specific dates is that governmental agencies prevented or delayed such improvements. In fact, those governmental agencies' actions against [GDC] that delay or prohibit improvements arise from [GDC's] lack of required permits and plans and our lots are in areas not suitable for development under present conditions, if ever;" and

(11) "To cover up the above outrageous facts and breaches of agreement, [GDC] regularly raised the 'selling price' of its tens of thousands of virtually worthless lots and regularly communicated to us that such higher and higher 'selling prices' represented the appreciating 'market value' of our property. In fact, the property has no resale value."

(complaint exh. A) (emphasis in original). The letter further stated that the Federal Trade Commission was investigating GDC's "misleading sales practices;" that the Federal National Mortgage Corp. and the Federal Home Loan Mortgage Corp. were no longer buying mortgages from GDC; that numerous mortgage fraud suits were pending against GDC; and that a Miami grand jury was investigating GDC. The letter further detailed certain pertinent court actions including, (1) a Florida state court's determination that GDC's failure to provide streets at the Port St. Lucie subdivision constituted a material breach of con-

tract; (2) a Florida trial court's denial of certification of the North Port lot owners as a class (apparently since overturned); and (3) a federal district court's determination that associations, such as the North Port Association, were permitted to institute a recovery action "as this North Port Association has" (complaint exh. A).

The letter further urged individual lot owners in the particular state to attend the planned meeting. The letter also explained:

The "North Port Out-of-State Lot Owners Association" ... is being organized and formed by non-residents of Florida who purchased property from [GDC] at North Port. The purpose of this Association is to inform out-of-state North Port lot purchasers of: (1) our research and other litigation results concerning North Port in general and our unimproved and worthless property in particular; (2) the "Association Recovery Action" in behalf of Association members who become informed at Association meetings and decide to have their individual claims filed; and (3) the experienced law firms and professionals retained to individually represent each Association member and file suit in behalf of each member.

(id.). The letter then articulated the date, time and location of the meeting and, in closing, reiterated that all interested individuals should attend as "[y]our right to become informed and demand full recovery are clearly at stake" (complaint exh. A.).

The complaint further stated that Mr. Binstein and Mr. Joel came to an agreement whereby the Association would hand out blank retainer agreements to prospective plaintiffs. These agreements provided that Mr. Joel's firm would institute "all necessary and appropriate proceedings and claims, and negotiate for a settlement of ... claims with any defendants or other party" (complaint exh. B). Mr. Joel's representation is explained to the individuals in an Association-generated document labeled "The Association Recovery Action." There, it is stated that

[t]he Association in 1988 retained an experienced law firm to individually represent each Association member. The name of that law firm is Richard Joel and Associates.... That law firm has offices in New York and New Jersey. Richard Joel, senior partner, will be in charge of members' individual litigation. We urge lot purchasers to independently verify the professional standing and experience of that law firm through their personal attorney or local Bar Association

(complaint exh. D).

Once at these meetings, referenced in letters like the one detailed above, it appears that Mr. Binstein urged interested individuals to join the Association's and take up the cudgels against GDC. For instance, at the October 10, 1989 meeting in Albany, New York, over which Mr. Binstein presided, Mr. Binstein first explained that he was not an attorney, but that he had thirteen years experience in researching fraudulent land developments and was responsible for bringing seven fraudulent companies into bankruptcy and was responsible for the prosecution of certain corporate officers (see Hasselhorst Aff. para. 4; exh. A). He informed his audience that after three months of research, he had decided that GDC was guilty of fraud, breach of contract, cover-up, mail and wire fraud and racketeering under the RICO act (id. para. 7; exh. A). In a report of the meeting, it is stated that Mr. Binstein observed that, "[e]ach year GDC would raise the price of homesites and then claim that the value of the land increased, but since these homesites were unbuildable lots (very low and, in some cases, still under water) they were in reality, worthless. The only increase that took place was in the price" (id. exh. A. (Hasselhorst report)). He then, among other things, articulated other North Port ills, including (1) that certain parts of North Port were "so low" that it would take millions of dollars to build proper drainage, canals, and roads, and, therefore, that "owners could count on inhabiting this particular area in about 200 years;" (2) that the City of North Port, counties, and state of Florida were in collusion with GDC by giving GDC favorable treatment; (3) that North Port residents contributed to GDC's scheme by advising unwary friends from the North to come down to Florida; (4) that several Florida real estate companies were "shills" for GDC; (5) that GDC's trade-in options, while facially acceptable, operated to the prejudice of the purchaser in the long run; and (6) that GDC people might go to prison for violating the RICO Act. It appears that, in addition to this particular meeting, the Association held other meetings in Saddle Brook, New Jersey; Queens, New York; Elmsford, New York; Albany, New York; Connecticut; and Lexington, Massachusetts (complaint para. 12). It is reasonable to infer that the same basic themes were dealt with at these meetings.

In view of Mr. Binstein's and Mr. Joel's conduct, GDC filed a complaint with the United States District Court for the Southern District of New York on October 27, 1988. In this complaint, GDC states that certain parts of the letters that Mr. Binstein sent were false. First, as to the letters' statement that "North Port lots sold by General Development have no resale value and cannot be developed in the foreseeable future, if ever," GDC averred that "over 90% of the homesites in North Port are presently developed with paved roads and drainage facilities and the remaining homesites are expected to be developed over the next three years." GDC further stated that many North Port lots have been resold and that they indeed had resale value (complaint para. 13).

Second, as to the letter's statement that the property "that was described as an 'excellent investment,' 'homesite' or 'commercial' lot, and is among the tens of thousands of such lots not improved and not located in the tiny 'core' area," GDC stated that, in truth, of the approximately 66,000 homesites located in North Port, some 60,-000 have been improved with paved roads and drainage facilities. GDC further stated that it does not sell real estate for the buyer's *investment*, but for *use*, as its sale documents clearly relate (id. para. 14).

Third, with respect to the statement in the letter that "[l]egal actions and investigations, governmental and private, and our independent research evidence that our property is virtually worthless as an investment and will remain unimproved despite [GDC's] representations and/or guarantees to the contrary," GDC explained that there was no governmental or private legal action indicating that North Port lots are "virtually worthless" (complaint para. 15).

Fourth, as to the statement in the letter that "[a]lthough [GDC] guaranteed paved roads and drainage, [GDC] did not make such improvements [sic] and/or failed to maintain the roads and drainage canals for the limited number of lots for which it initiated such limited improvements," GDC responded that it provided roads and drainage facilities to approximately 60,000 of the 66,000 homesites in North Port. GDC also stated that it discharged its obligations with respect to all improvements (complaint para. 16).

Fifth, as to the statement in the letter that "[a]s a result of [GDC's] failure to maintain roads and drainage to the limited lots [GDC] did improve, coupled with the City of North Port's refusal and inability to maintain our lots, roads are so cracked, potholed and overgrown so as to be impassable and hardly recognzeable [sic], and drainage canals are so weed-filled and obliterated so as to create endless flooding," GDC retorted that over 90% of the North Port homesites were improved with roads and drainage facilities and that GDC discharged its contractual obligations to maintain these improvements. GDC further submitted that all of the hundreds of miles of roads in North Port were passable by conventional automobiles (id. para. 17).

Sixth, as to the statement in the letter that GDC "never had plans or permits to fully improve our lots and environmental and other restrictions at North Port can prevent utilities and services from ever being completed or available to our property," GDC responded that it had plans to provide roads and drainage, and that it had permits to build 95% of the homesites with the necessary roads and homesites, and

that it completed improvements with respect to 90% of those homesites, and that it was not aware of any restrictions preventing utilities and other services from being completed as required (id. para. 18).

Seventh, as to the statements in the letter that "[i]f paved roads ever were extended to our property as guaranteed, the City of North Port will not accept or maintain them until at least 90% of lots are improved and with houses on them. This means that, at past and current rates of growth and building demand at Port Charlotte and North Port, *we will have no roads accepted or maintained for more than 300 years*. One reason for this outrageous fact is that North Port is quite low and wet land and unsuitable for intensive development because of potential for flooding and its need for extensive drainage" (emphasis in original), GDC responded that paved roads were built to reach than 90% of the North Port homesites and were to be extended to virtually all of the North Port homesites in the next three years. It further indicated that the City of North Port had accepted all constructed roads for maintenance, except for five platted units which the City slated for acceptance sometime in 1989 and which were in good condition. GDC also indicated, with respect to the purported falsity of these statements, that North Port possessed an operational storm water management system and that North Port was not a "wet land ... unsuitable for intensive development because of potential flooding and its need for extensive drainage" (id. para. 19).

Eighth, as to the statement in the letter that "[i]n more than 20 years, [GDC] improved less than 10% of lots sold at North Port and Port Charlotte with central water and sewers," GDC responded that it had no obligation to provide central water and sewer to all homesites in North Port and Port Charlotte, and that central water was available to over 50% of the North Port and Port Charlotte homesites and central sewer facilities are available to more than 10% of such homesites. Further, GDC stated that it fulfilled or would fulfill its obligations to those customers that it made commitments to with respect to central sewer and water

facilities, or in the alternative, it would provide these individuals with another available homesite that possessed such facilities (complaint para. 20).

The complaint further states that Mr. Binstein uttered falsehoods at the various organizational meetings of the Association, in particular stating that:

(1) GDC was guilty of fraud and RICO violations;

(2) GDC "swindled" people by selling lots as investments;

(3) GDC's homesites were on unbuildable lots;

(4) the City of North Port was part of the "scam;"

(5) GDC never obtained any of the necessary permits and approvals from the State of Florida to develop North Port;

(6) the residents of North Port were part of a conspiracy with GDC to defraud people living in the North;

(7) GDC targeted nine areas in the North within which to perpetrate "land scams;"

(8) GDC has been ordered by a court not to refer to its lots as homesites; and

(9) the people at GDC responsible for the "swindle" may go to jail for violating RICO.

(complaint para. 26). Based on these purported falsehoods, GDC brought suit against Mr. Binstein lying in defamation (libel and slander); false disparagement of GDC's product ("trade libel") and injurious falsehood (*see* complaint paras. 31–43).

Moreover, (a) in view of the retainer agreement, which, GDC believed evinced some relationship between Mr. Binstein and Mr. Joel, and (b) in view of the alleged misrepresentations contained in the disclosure statement labeled "The Association Recovery Action"—namely, (1) that Mr. Joel was a sophisticated and experienced practitioner; (2) that GDC committed RICO violations; (3) that the Association hired Mr. Binstein, when, in reality, Mr. Binstein and the Association were one in the same (complaint paras. 23–25), and (c) in view of Mr. Binstein's alleged nondisclosure to the Association members and the prospective members that (1) the government earlier had convicted him for securities fraud; (2)

a federal court found that he had earlier misappropriated and misused association funds; and (3) injunctions were entered against him prohibiting him from soliciting similar litigation, GDC stated further claims against both Mr. Binstein and Mr. Joel. Specifically, GDC asserted that Mr. Binstein had tortiously interfered with GDC's contract or prospective contractual relations, with Mr. Joel being of substantial assistance in committing those violations (complaint paras. 44–51).

GDC also asserted that the defendants violated various fair-trade-practice/consumer-fraud provisions of New Jersey, N.J. Stat.Ann. § 56:8–2; Massachusetts, Mass. Gen.L. ch. 93A § 2; Connecticut, Conn. Gen.Stat. 735a § 42–110b; and New York, General Business Law §§ 349(h) & 350–d based on their activities in soliciting litigation against GDC by means of communications that contain misrepresentations and omissions (complaint paras. 52–66). Last, GDC asserted that Mr. Joel has violated certain ethical and statutory provisions regarding the improper solicitation of legal business with Mr. Binstein aiding, abetting, and assisting him in this regard (complaint paras. 67–70). The plaintiff submitted that this alleged improper solicitation constituted intentional tort, "unlawful maintenance and barratry at common law" (id.).

The defendants did not answer these allegations immediately. Rather, when this action was pending in the United States District Court for the Southern District of New York before Judge Broderick, the defendants filed motions for summary judgment dismissing the complaint in late, 1988. It appears from the record that Judge Broderick, at first, continued the motion due to a rule of his court. In a January 9, 1989 order, he explained: "I have a rule, binding on litigants represented by counsel and *pro se* litigants alike, that a pre-motion conference is to be requested (and held) before motions may be filed." Later, however, on August 31, 1989, it appears that Judge Broderick did rule on the defendants' motions, stating,

I deny the motions to dismiss the complaint. I must say that I have given

some consideration to the argument that this complaint essentially sounds in defamation and there certainly is some indication in the record before me that it may ultimately be established that General Development is defamation proof; but I am not prepared to make a finding to that effect on the free-swinging, high-floating record that is before me right now.

There are questions of fact and those questions of fact, in my judgment, preclude the grant of summary judgment. I did at an earlier stage state that I regarded this complaint as in the nature of a pre-emptive strike. I have not changed that assessment. It's an assessment which is predicated on what has come before me in this case as it has thus far developed. I think I made that statement in the context of a reference of the case to the magistrate for the supervision of discovery. And I think in due course I will refer this case back to the magistrate to supervise discovery.

(*See* excerpt of August 31, 1989 proceeding before Judge Broderick, attached as exh. 2 to the Affidavit of David Dunn in support of the plaintiff's cross motion for sanctions dealt with in my December 11, 1989 opinion). After Judge Broderick rendered his decision, the parties consented to a transfer to this district, and subsequently, to me "for the convenience of the parties and witnesses, in the interest of justice," "with the thought that it could be there consolidated" with the *Rolo* matter in September, 1989. Then, to use a tired phrase, "all hell broke loose."

On September 29, 1989, Mr. Joel, at the time appearing pro se, filed a motion for summary judgment, or, alternatively, for a stay of the proceedings pending the outcome of *Rolo*. On October 23, 1989, Mr. Binstein joined the fray, filing a similar application. On October 30, 1989, GDC filed a cross-motion for Rule 11 sanctions. On December 11, 1989, I conducted argument and then ruled. I first denied the defendants' motions for summary judgment which had been based on three essential contentions (1) that the plaintiff was barred from asserting its claims because it

had unclean hands; (2) that the plaintiff was barred from asserting its claims because it was "defamation proof;" and (3) that Mr. Joel was simply not involved in any wrongful conduct.

With respect to the "unclean hands" question, the defendants asserted that because homeowners, the media, realtors, banks, and other sources recognized and criticized certain allegedly irregular practices of GDC, this barred GDC from instituting this action. I disagreed with the defendants' position that the action should be dismissed based on unclean hands at that time. In so doing, I first held that such a defense was only applicable to claims for equitable relief. *General Development Corp. v. Binstein*, Civ. A. No. 89–3820, transcript of proceedings, at 54 (D.N.J. December 11, 1989) (unpublished). I then concluded that there was no genuine dispute that the defendants had standing to assert the defense, because the "uncleanliness" of which the defendants' complained was clearly related to the allegations of the plaintiff's complaint. Id. at 55. I finally concluded, however, that the plaintiff had put forward affirmative evidence indicating a genuine issue of material fact with respect to whether the defense was viable in this instance. Id. at 55–56.

As for the "defamation-proof" defense, I determined that there were genuine issues of material fact as to whether the plaintiff's reputation had been so besmirched that the plaintiff was rendered defamation proof. Id. at 61. As for the contention that Mr. Joel was not culpable, I concluded that there was a genuine factual dispute as to whether Mr. Binstein was Mr. Joel's agent and, thus, denied the defendant Joel's motion for summary judgment in this respect, as well. I also denied the defendants' motion for a stay and all of the parties' motions for Rule 11 sanctions. Id. at 66.

In February and March, 1990, of this year, the parties again filed motions with the court. Specifically, Mr. Binstein renewed his motion for summary judgment based on the doctrine of unclean hands. Again, he trundled out many newsclippings

and articles concerning GDC's purportedly fraudulent activity which he had utilized in his first application to this court. In addition to these submissions, however, he also based his motion on the fact that a federal grand jury sitting in the United States District Court for the Southern District of Florida had returned a sixteen count indictment against GDC and that GDC and certain corporate officers had agreed to plead guilty to count 16 of the indictment—conspiracy to commit mail fraud and interstate transport of persons in furtherance of fraud. Mr. Binstein notified the court of this fact in mid-March, 1990.

The indictment named GDC, GDV Financial Corporation, and two corporate officers (Robert F. Ehrling and David F. Brown). The indictment stated that pursuant to a scheme and artifice, "GDC sold over 11,000 houses from January 1, 1982, through December 31, 1988, and received as proceeds from such sales over $850 million" (Indictment para. 5). The indictment further charged:

> The essence of this scheme and artifice was to induce GDC customers to purchase GDC houses by misleading them as to the nature of the housing market in the Florida communities in which GDC operates, as to the value of their investment in their GDC house and as to the advantages of owning a GDC house. More specifically, the scheme and artifice were carried out by concealing from customers that the prices of GDC houses are ... substantially higher both than the prices of other comparable new houses in those same communities and than the prices at which GDC houses can be resold. Second, it was carried out by misleading customers into believing that they had equity in their houses equal to their cash investment and the "appreciated value" of their homesites when, in fact, their equity in their houses was substantially smaller or nonexistent since GDC houses have a value in the open market much lower than the mortgages placed upon them. GDC and the defendants were able to conceal GDC's inflated house prices and to misrepresent to customers the value of GDC houses

through the use, by GDC Financial, of the non-conforming appraisals, which lulled customers into the unjustified belief that they were receiving full value for their money.

> The scheme and artifice were carried out through: (a) direct dealings with the purchaser which were intended to induce him to buy a GDC house; (b) measures which were intended to conceal generally from the buying public that GDC's houses are priced substantially above the rest of the housing market; and (c) measures intended to minimize the monetary loss to GDC caused by the eventual discovery by some GDC homeowners that the equity in their houses was non-existent or much smaller than they reasonably believed and that their homes were substantially over-priced.

(Indictment paras. 6–7). With respect to the initial inducement, the indictment charged that "GDC's efforts to sell houses [were] directed primarily at owners of undeveloped GDC homesites" (Id. para. 8). These charges were essentially repeated in count 16 of the indictment which charged that from July 1, 1985 through, on or about, but no later than July 1, 1986, "the defendants GDC, Robert F. Ehrling, and David F. Brown knowingly, willfully and unlawfully, did combine, conspire, confederate and agree with persons known and unknown to the Grand Jury to violate Title 18, U.S.C., Section 1341 (mail fraud) and Title 18, U.S.C., Section 2314 (interstate transport of persons in furtherance of a fraud)" (indictment, count 16, para. 5).

On March 22, 1990, GDC, Robert F. Ehrling, and David P. Brown conditionally pled guilty to count 16 of the indictment before United States District Court Judge Lenore C. Nesbitt in the United States District Court for the Southern District of Florida. There, Mr. Andres Rivero, representing the United States Government proffered that during the period of July 1, 1985 through July 1, 1986, GDC targeted certain nonFlorida residents to buy lots. Then, after two or three years, according to Mr. Rivero, GDC would approach these lot owners soliciting them to buy homes by trading the lot

toward the purchase of the home (Transcript of March 22, 1990 proceeding at 49–50). Mr. Rivero indicated that the sale of the lots was the enticement into the fraud. Mr. Rivero explained:

> The Company used that lot as a hook to sell homes to the universe of lot owners. After a lot was actually sold, what the company did during the relevant time period was to send literature to the universe of lot owners and also to contact them by telephone at different points for different purposes.
>
> During the course of such contacts, the Company represented to lot owners that their lots were appreciating, that the lots had consistently appreciated over the past. Now, in literature they would take the position that it was appreciation in price. On a common basis, salesmen would take the position that there had been appreciation in value of the lots.
>
> In fact, there had been no appreciation in value, no appreciation in value of the lots comparable to the appreciation in price. In other words, there was no relationship between the constantly rising prices and local market values.

(Transcript of Mar. 22, 1990 proceedings, at 52–53). At the same time, per Mr. Rivero, GDC was stating that the prices of GDC homes were spiraling. Mr. Rivero stated, "[e]ssentially, the Company used the increase in sales prices to create a sense of urgency among lot owners that there was a need to buy now before prices increased in the future" (Id. at 53). The purpose of all of this was to lead the lot owners into believing that they should immediately invest in a GDC home (id. at 54)—homes, that, as was noted in the language quoted above from the indictment, were seriously overvalued.

Mr. Charles Simons, a GDC director since 1985 (id. at 64–65), pled on behalf of GDC. Pertinently, the allocution reflected:

> THE COURT: Is the corporation pleading guilty freely and voluntarily to this charge because they believe that they are guilty?
>
> MR. SIMONS: Yes, Your Honor.

THE COURT: Now, you have been in the courtroom when the summary of the facts was presented by Assistant United States Attorney Mr. Rivero, were you not?

MR. SIMONS: I did hear it, Your Honor.

THE COURT: Are those facts substantially true and correct?

MR. SIMONS: I don't think I personally have seen enough evidence to give you an answer to that question.

THE COURT: Well, let's see. Mr. Josefsberg?

MR. JOSEFSBERG: I think I can answer that, Your Honor. Mr. Rivero's description of the marketing practices is necessarily general. The practices actually followed obviously differed from purchaser to purchaser.

The Company admits that some of the practices described by Mr. Rivero were followed with respect to a substantial number of customers. It does not admit that each of the practices were followed with respect to each G.D.C. customer or any particular number of customers.

We therefore agree that a sufficient amount of these facts occurred as to a significant number of sales and therefore we believe that there is a predicate factual basis to support the charge under 18 U.S.C. 371, and we urge you to accept the plea.

THE COURT: Well, do you agree at least as to some of the particular overt acts described?

MR. JOSEFSBERG: Yes, Your Honor.

THE COURT: That General Development Corporation did commit those acts?

MR. JOSEFSBERG: Yes, Your Honor.

THE COURT: Are you satisfied with that answer, Mr. Moscowitz and Mr. Rivero, as an understanding and acceptance of a plea of guilty as to Count 16 or would you prefer in detail to enumerate the elements again?

MR. MOSCOWITZ: No, Your Honor. We believe that's appropriate. We would not in any case require in a description of the complex scheme that the defendant agree to each and every fact,

but they agree to a sufficient number of those facts to admit their guilt. (Id. at 70–72). Judge Nesbitt deferred acceptance of the plea pending consideration of the presentence report and pending the finalization and filing of a consent decree in which GDC was to offer a program for restitution to homesite buyers for a period from 1983 to 1990 (id. at 84).

Now, this information concerning the contents of the plea was not forwarded fully to me until May, 1990. In the meantime, however, in addition to Mr. Binstein's renewed motion for summary judgment based on, essentially, the effect of the indictment and the agreement to plead, the plaintiff moved to compel discovery and for Rule 11 sanctions. Mr. Binstein also requested sanctions against the plaintiff, but did not file a motion in this regard. While not filing a motion, I also received a letter from Mr. Joel's counsel concerning the collateral-estoppel effect of the guilty plea in this action. These applications and letters came to the court throughout the month of March, 1990.

On April 9, 1990, I was poised to hear argument regarding these motions. At that time, however, Mr. Dunn, one of GDC's many counsel (and counsel who had appeared, at least to me at that time, to be conducting this litigation on GDC's behalf) informed me that at 5:30 p.m. on April 6, 1990, GDC filed a chapter 11 bankruptcy petition with the United States Bankruptcy Court for the Southern District of Florida (Transcript of April 9, 1990 proceeding, at 2). Mr. Dunn then related:

> I don't think I have authority to proceed here this morning. I have not yet been retained as counsel to the debtor-in-possession. So there is no counsel—although, obviously, I recognize my responsibilities as counsel of record to General Development in this case—but there is no counsel who has been retained and no determinations that have been made with respect to this case.
>
> Obviously, as to the Rolo case, the automatic stay of Section 362 operates, but because this action was brought by General Development Corporation, at

least with respect to the claims that have been made by it against the defendants, the automatic stay would not apply.

> The determination will have to be made by the new management of the company, which is the debtor-in-possession, of how and to what extent they wish to continue to proceed with this litigation. And I do not know the answer to that question....
>
> We would, therefore, request the Court's indulgence to provide a period of time during which the company can make that determination and your Honor and opposing counsel and Mr. Binstein can be informed of whether General Development—and under what circumstances it [—]intends to prosecute this litigation.

(Id. at 7). In light of this fact, I did not render decision on that day concerning the pending motions because it was uncertain whether the plaintiff's counsel could still speak for the plaintiff.

Further, during the course of this proceeding, Mr. Binstein asserted that Mr. Simons had charged that Cravath, Swaine & Moore, one set of counsel for GDC in this action, had concealed facts from the GDC directors. Mr. Binstein therefore questioned whether counsel ever had authority to proceed in this litigation (id. at 9–10). I respectfully abbreviated Mr. Binstein's inquiry because of the new procedural posture of the case. But, from the state of the papers that I had received in this action, and the changing circumstances of this action (changes which seemed to be occurring everyday), I began to wonder whether the plaintiff was bringing this suit in accordance with the Federal Rules of Civil Procedure. I explained,

> [f]or example, I am at a loss to understand how an attorney in good faith could state in a brief that no Florida court has ever held that GDC defrauded any customer by failing to disclose that its prices were higher than those found elsewhere—I'm referring to GDC's brief at page 9—and then, days later, agrees, on behalf of his client, to plead guilty to charges of conspiracy to defraud in the

United States District Court in the Southern District of Florida.

Nor can I fathom how anyone could get the idea that my earlier decision in the Rolo action was a ruling that this case was without merit. I merely ordered the [*Rolo*] plaintiffs to amend the complaint. I expressly made no decision on the dispositive motions.

Put plainly, this case is beginning to have a particularly malodorous taint.

Hence, should there be any further indications from the papers which would lead one to reasonably conclude that this litigation was undertaken in bad faith, I will order the plaintiffs to show cause why this Complaint should not be dismissed and a sanction under Rule 11 and the Court's inherent power to guard against bad faith litigation and why severe compensat[ory] and punitive monetary sanctions should not issue against the plaintiff and counsel.

I think I've said quite enough.

(id. at 12–13). I contemplated that the plaintiff would get back to me by the time of the next motion day, April 25, 1990, with more information concerning its status.

On April 11, 1990, the court received a copy of a letter from Mr. Joel's counsel to GDC's counsel, Mr. Dunn, asking that GDC submit a full copy of the March 22, 1990 plea proceedings before Judge Nesbitt to me. In that letter, Mr. Joel's counsel charged Mr. Dunn with furnishing the court with only selected pages of the transcript so as to limit the preclusive effect of the guilty plea on GDC. Subsequently, GDC sent me a full transcript which formed the basis for my detailing the occurrences of the plea proceeding above.

On May 24, 1990, Mr. Dunn's partner, Mr. Edwards, informed me that Judge Cristol of the United States Bankruptcy Court for the Southern District of Florida approved the retention of Mr. Dunn's and Mr. Edwards' firm, Davis, Markel & Edwards for the limited purposes of (1) achieving a settlement in this matter or (2) securing a dismissal of the action without prejudice. I should also note that around the same time Mr. Binstein forwarded correspondence to me indicating his concern about the proceedings in the bankruptcy court and asking for an emergency hearing.

In light of these matters occurring after the April 9, 1990 proceeding, on June 1, 1990, I informed the parties that I would hear any and all motions that they had filed, or wished to file, on June 29, 1990. I also informed them that I would be specifically dealing with the issue of whether GDC and its counsel should be sanctioned for instituting and conducting this litigation.

Heeding my invitation, the defendant Joel joined the defendant Binstein's renewed motion for summary judgment and also added that he requested dismissal of the counts against him based on the doctrines of collateral estoppel and standing. In turn, the plaintiff moved for a voluntary dismissal without prejudice based on Fed. R.Civ.P. 41(a). As I noted above, I heard the parties on June 29, 1990. Thereafter, the parties furnished me with additional submissions.

On July 16, 1990, I received a letter from Mr. Redmon of Davis, Markel & Edwards. Therein, he informed the court, "[i]t has just come to my attention that Judge Nesbitt of the United States District Court for the Southern District of Florida has refused to accept the conditional guilty pleas of GDC and the individual defendants in the criminal matter pending before her."

Specifically, on July 13, 1990 Judge Nesbitt advised GDC, among others, that she would not accept the plea of guilty. She stated, "I am not prepared to accept the pleas of guilty because I am not satisfied that the penalties that could be imposed for the single count of the indictment is commensurate with the alleged, and I say alleged again, because that is all it is at this point, massive fraud and the crimes that are set forth in the government's 16 count indictment" (transcript of July 13, 1990 proceeding, at 3–4). The judge further explained:

Now, if convicted of all counts as charged in the indictment, the total aggregate fines that could be imposed as

to G.D.C. is 7.5 million approximately....

Now, I am by no means expressing any opinion as to the accuracy of the charges, whether they can be proved at trial and, of course, I am not suggesting that the sentences that are statutory sentences would in fact be imposed in toto.

It is only my view that any sentence that the court could presently impose would not be commensurate with the magnitude of the total criminal conduct allegedly committed and alleged in the indictment.

After considering the alleged egregious nature of the fraud covering a seven year period and involving thousands of people and the projected enormity of the loss, I am not prepared to be bound to impose a fine and a penalty for a fraction of the period of the total time the defendants were allegedly involved in fraudulent activity and for a fraction of the dollar loss involved.

In short, in my view, punishment must reasonably be tailored to and proportionate to the crime, and I don't believe that these plea agreements as presented allow me as the court the latitude that is reasonably necessary to make that evaluation properly.

(Transcript of Proceedings, at 7–8). Such is the status of this matter at the moment.

## DISCUSSION

The following applications are before me: (1) the defendants' application for summary judgment/dismissal with prejudice based on the defenses of unclean hands and collateral estoppel, and based on lack of standing to sue; (2) the plaintiff's application for dismissal without prejudice under Fed.R. Civ.P. 41(a) and the defendant Joel's application for dismissal with prejudice based on Rule 41(a); (3) the plaintiff's application to compel discovery; and (4) the applications for Rule 11 sanctions.

1. Motions for Summary Judgment

The defendants essentially have moved for summary judgment.[1] Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" (emphasis added). Of course, it is axiomatic that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

An issue is "genuine" "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510; *see Williams v. Borough of West Chester,* 891 F.2d 458 (3d Cir.1989). In *Williams,* the United States Court of Appeals for the Third Circuit defined the amount of evidence necessary to make an issue "genuine." The appellate court explained that the affirmative evidence adduced by the nonmovant in opposition to the application, regardless of its direct or circumstantial nature, "must amount to more than a scintilla [, a mere trace], but may amount to less (in the evaluation of the court) than a preponderance," 891 F.2d at 460–61, 464, for the nonmovant to successfully oppose a motion for summary judgment.

As to the materiality of the facts adduced, the substantive law will identify what facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510 (*citing* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 2725, at 93–95

---

1. The defendants have moved for Fed.R.Civ.P. 56 summary judgment and/or for a dismissal with prejudice under Fed.R.Civ.P. 41. The standard under either of these rules is basically the same, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) *and Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 476 (3d Cir.1979). That being the case, I will utilize Rule 56 precedent in assessing this application.

(1983)). Here, the defendants have contended that the claims in the complaint should be dismissed based on standing, unclean hands, and collateral estoppel. I turn to the substantive law bearing on the application of these doctrines.[2]

### A. Standing

It appears that the defendants have called into question the plaintiff's standing to sue under the New Jersey, New York, Connecticut and Massachusetts consumer-fraud/fair-trade acts. In this regard, the defendants assert that since the plaintiff is not a competitor of the defendant and, apparently, since GDC is not a customer of the defendants, the plaintiffs have no standing to sue under the various acts in question. The relevant statutes differ. Since the defendants only have specified their arguments with respect to the New Jersey and New York statutes, I only will consider the merits of the defendants' applications with respect to those statutes. Obviously, their application with respect to the Connecticut and Massachusetts statutes, without more from them, is denied.

#### (i) New Jersey

■ The New Jersey Consumer Fraud Act provides:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived

or damaged thereby, is declared to be an unlawful practice.

N.J.Stat.Ann. § 56:8–2. The Act provides a remedy to "[a]ny person" who suffers damages as a result of conduct declared unlawful under the act. *Dreier Co. v. Unitronix Corp.,* 218 N.J.Super. 260, 272, 527 A.2d 875 (App.Div.1986); *Hundred East Credit Corp. v. Eric Schuster,* 212 N.J.Super. 350, 355, 515 A.2d 246 (App.Div.), *certification denied,* 107 N.J. 60, 526 A.2d 146 (1986).

The defendants have argued that the plaintiff does not have standing to sue under this Act for the plaintiff is neither consumer nor competitor. In response, the plaintiff has relied on *Feiler v. New Jersey Dental Ass'n,* 191 N.J.Super. 426, 430–31, 467 A.2d 276 (Ch. 1983), *aff'd,* 199 N.J.Super. 363, 489 A.2d 1161 (App.Div.), *certification denied,* 99 N.J. 162, 491 A.2d 673 (1984). There, the New Jersey Dental Association ("NJDA") brought suit against a dentist to enjoin him from submitting untruthful billings to insurance carriers and third-party payers. The NJDA sued the defendant on behalf of its dentist members. The plaintiff believes that it, like the NJDA, is suing in the public interest and, thus, has standing to sue.

However, I believe that there is an important difference between the NJDA and GDC. In *Feiler,* the NJDA and its members interests were aligned. In the instant case, GDC does not have the same alignment of interest and fiduciary relationship. In fact, its interests are adverse to at least part of the group on whose behalf it would be suing—the *Rolo* plaintiffs. Put simply, GDC is an adversary, not a fiduciary, of the class of consumers allegedly affected by the solicitation. Since it is not a party

---

**2.** I note that in my earlier opinion, I concluded that the law of the transferee court would apply to this action based on the United States Court of Appeals for the Third Circuit's decision in *Ferens v. Deere & Co.,* 862 F.2d 31, 35 (3d Cir.1988). *See* Transcript of Dec. 11, 1989 proceedings, at 68–69. The United States Supreme Court has now reversed the Third Circuit's ruling in *Ferens* by a 5–4 vote, holding that a transferee forum must apply the law of the transferor court, regardless of who initiated the transfer. —— U.S. ——, ——, 110 S.Ct. 1274,

——, 108 L.Ed.2d 443 (1990). Accordingly, New York choice of law rules should apply to this action. As I acknowledged in my earlier opinion, New York choice of law rules would inevitably lead to the same conclusion as New Jersey choice of law rules in this action—that conclusion being that Florida substantive law would apply to the common-law claims. *See* transcript of proceedings, at 68–69. Thus, the United States Supreme Court's decision in *Ferens* does not change the law of this case.

entrusted to protect the rights of its constituents, as the NJDA was in *Feiler,* I believe that the *Feiler* case does not aid GDC's argument that it indeed has standing.

GDC does not fall into a category of person that the New Jersey Act was designed to protect. Although the New Jersey statute is broad, there is no New Jersey judge-crafted law which extends the act's scope beyond consumers, *see Hundred East Credit Corp.,* 212 N.J.Super. at 355, 515 A.2d 246 and competitors in a commercial sense, *see Feiler,* 191 N.J.Super. at 432, 467 A.2d 276. The plaintiff has cited me to no more expansive authority in this regard. It has argued, however, that it competes with the defendants Binstein and Joel for the loyalty of GDC customers. The plaintiff is not exactly correct; if indeed it is a competitor, then it competes with the Association—an entity unnamed in its complaint—for such loyalty. Accordingly, its consumer-fraud complaint, if any, is with the Association.

Further, and more important, the plaintiff has not pointed this court to any evidence which reasonably indicates how this battle for loyalty translates into commercial competition between itself and the defendants, *see* GDC's Memorandum in Opposition to Defendant Joel's Motion to Dismiss with Prejudice, at 9–11—after all, the defendants are not seeking to sell homesites or lots (what GDC does) to GDC customers, they merely seek to ensure that the people that they represent on behalf of the Association get what they paid for from GDC. Clearly then, the plaintiff, not having pointed the court to evidence buttressing its argument that it has standing as a competitor in the commercial sense, cannot evade summary judgment on the issue of standing to sue under N.J.Stat.Ann. § 56:8–2. *See Williams,* 891 F.2d at 464 (nonmovant must come forward with affirmative evidence creating genuine issue of material fact to escape a summary determination). I will grant the defendant's motion for summary judgment with respect to the New Jersey statute.

(ii) New York

■ The plaintiff also has alleged that the defendants have conducted solicitation through false representations and omissions violative of New York General Business Law §§ 349(h) and 350–d. Section 349(a) provides: "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are declared unlawful." The private right of action for violations of this section is contained in Section 349(h) which states:

> In addition to the private right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

Section 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." The private right of action for such violations is specified in Section 350–d(3); its terms are akin to those of § 349(h). Since these two acts are companion statutes, *see Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1292 n. 4 (S.D.N.Y.1988), I will consider the defendants' standing challenge regarding both sections together.

The defendants again have challenged the plaintiff's standing to sue under these sections because the plaintiff is neither consumer, nor competitor. GDC retorts that under the New York statutes, standing is not limited to consumers, and that the statute broadly protects incidental injury to competitors, too. GDC reasons that, "[i]f a competitor has standing to sue for false and misleading statements to customers,

then GDC—which is competing with Mr. Binstein and Mr. Joel for the loyalty of GDC's customers—should also have standing in this case." GDC's memorandum of law in opposition to the defendant Joel's motion to dismiss, at 11.

I conclude that GDC does not have standing to sue under the pertinent sections of this statute. As I stated with respect to the New Jersey statute, the plaintiff (non-movant) has pointed to nothing in the record to indicate that the plaintiff and the defendants are competitors in the commercial sense. The New York statutes extend to competitors and consumers. *See Coffaro*, 697 F.Supp. at 1292 ("Competitors, as well as consumers, are given the right to sue under N.Y.Gen.Bus.Law § 350–d."). The plaintiff, being neither, does not have standing to sue.

■ Alternatively, even if the plaintiff's identity did not matter in the standing calculus under the New York acts, the plaintiff has specified nothing of record, *see* plaintiff's memorandum of law in opposition, at 9–12, which demonstrates that the primary injury from the defendants' acts would be to consumers (or the public). *See Coffaro*, 697 F.Supp. at 1292 (to have standing to sue under New York statute, primary injury must be to consumers or public); *see also* R. Givens, "Practice Commentaries," 19 McKinney's Consolidated Laws of New York 565, 572 (West 1988) ("If competitive injury is the principal issue, use of GBL §§ 349–50 may be misplaced because its purpose is to protect consumers, not competitors, as such."). In fact, from the record now constituted, it appears that GDC has much more to lose than does the public or consumers from the defendants acts—namely, this failing company's ability to attract customers would be diminished, in turn having a devastating

affect on its ability to make money and pay its creditors (*see, e.g.,* plaintiff's supplemental memorandum with regard to the court's authority to dismiss with prejudice, at 5), and the crippling penalties facing it if it is found guilty in the criminal action. This loss would predominate over the loss to the individual consumers. Thus, the harm here (the primary injury) from the defendants' conduct is mainly to the financially ailing GDC, not consumers.

Accordingly, I conclude (1) that there is no genuine dispute that the plaintiff is neither a consumer or competitor of the defendants in the commercial sense and (2) that there is no genuine dispute that the primary injury here is to GDC and not consumers or the public. For these reasons, GDC does not have standing to sue under New York Business Law §§ 349(h) and 350–d(3).[3]

### (iii) Summary

I will grant the defendants' motion for summary judgment, dismissing the counts based on the New Jersey and New York consumer-fraud/fair-trade practices acts for lack of standing. I will deny the defendants' motion regarding the Connecticut and the Massachusetts statutes.

### B. Collateral Estoppel

■ The defendants have argued that summary judgment be granted in their favor and/or that the complaint be dismissed based on the collateral estoppel affects of the guilty plea in this action. The United States Supreme Court explained the doctrine in *Montana v. United States*, stating

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact

---

**3.** One commentator has articulated concern over the possible abuse of the New York act, warning,

> GBL [§§ 349–350] should not be permitted to become an adjunct to ordinary commercial litigation, arbitrarily raising the stakes through their one-way attorney's fee provisions. The goals of GBL §§ 349–350 were major assaults upon fraud against consumers, particularly the disadvantaged ... —not ad-

ventitious intervention in commercial or trade identification cases brought by one business against another. This reality may properly guide their interpretation.

R. Givens, *supra*, at 574–75. Similarly, courts must exercise care to ensure that GBL §§ 349–350 are not used to intimidate litigants and representatives from asserting their causes of action. I am mindful of this concern.

distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...." *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49 [18 S.Ct. 18, 27, 42 L.Ed. 355] (1897). Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.... Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.... To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979) (citations partly omitted) (footnote omitted). Various courts have proposed different formulations of the elements necessary to fulfill the collateral-estoppel defense, but generally, it is universal that the proponent of the defense must demonstrate that (1) there was a final judgment on the merits; and (2) that the issue had actually been litigated. *See Gregory v. Chehi,* 843 F.2d 111, 121 (3d Cir.1988) (Pennsylvania law); *Bower v. O'Hara,* 759 F.2d 1117, 1124–27 (3d Cir. 1985) (Gibbons, J.) (Virgin Islands law); *Haize v. Hanover Ins. Co.,* 536 F.2d 576, 579 (3d Cir.1976) (New Jersey law); *State v. Wilson,* 180 Conn. 481, 429 A.2d 931, 933 (1980) (Connecticut law); *Leventhal v. Krinsky,* 325 Mass. 336, 90 N.E.2d 545 (Mass.1950) (Massachusetts law). Since I do not believe that there has been a final judgment entered in the criminal matter at issue here, or that this matter been actually litigated, I conclude that the defendants' cannot avail themselves of the doctrine of collateral estoppel.

In the criminal-law context, a " 'judgment or decision is final ... only when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined.... Final judgment in a criminal case means sentence. The sentence is the judgment.' " *Yeloushan v. United States,* 313 F.2d 303, 304 (5th Cir.1963) (Carswell, D.J., sitting by designation) (*quoting Parr v. United States,* 351 U.S. 513, 518, 76 S.Ct. 912, 916, 100 L.Ed. 1377 (1956)) (emphasis added), *cert. denied,* 373 U.S. 912, 83 S.Ct. 1301, 10 L.Ed.2d 413 (1963); *see also United States v. Johnson,* 76 F.Supp. 542, 548 (M.D.Pa. 1947) ("A verdict without a judgment does not raise an estoppel or operate as res judicata or autrefois acquit."), *aff'd,* 165 F.2d 42 (3d Cir.1947), *cert. denied,* 332 U.S. 852, 68 S.Ct. 355, 92 L.Ed. 421 (1948). There has been no sentence in the criminal action pertinent to this case. In fact, the Judge Nesbitt recently has rejected the plaintiff's conditional plea of guilty. Since there is no final judgment regarding the prior criminal matter, the defendants have not satisfied one of the requisites for asserting the doctrine of collateral estoppel.

Further, the defendants have not demonstrated that this matter has been actually litigated, another requisite of the collateral-estoppel defense. *See, e.g., Bower,* 759 F.2d at 1125–26 (in a matter involving estoppel consequences of guilty plea, only matters actually litigated could provide basis for collateral estoppel under Restatement (Second) of Judgments). In fact, it is clear that these matters have not been litigated. Hence, the defendants' motion based on the collateral-estoppel consequences of the plaintiff's conditional plea of guilty to count 16 of the indictment returned in the United States District Court for the Southern District of Florida is denied.

*C. Unclean Hands*

 The defendants have moved for summary judgment based on the defense of unclean hands, as well. Unclean hands is an equitable defense. This defense therefore is only applicable with respect to

the plaintiff's claim for equitable relief—here, the plaintiff's prayer for injunctive relief prohibiting the defendants from engaging in improper solicitation through false and misleading statements and requiring them to refund any and all retainers received from their clients. *See* Transcript of Dec. 11, 1989 proceedings, at 54 (*citing, e.g., Ocean View Towers, Inc. v. First Fidelity Sav. & Loan Ass'n,* 521 So.2d 325, 326 (Fla.App. 4th Dist.1988)).[4] One treatise has explained the unclean-hands doctrine as follows:

> whenever a party who seeks to set the judicial machinery in motion and obtain some equitable remedy has violated conscience or good faith, or other equitable principle in his prior conduct with reference to the subject in issue, the doors of equity will be shut against him notwithstanding the defendant's conduct has been such that in the absence of circumstances supporting the application of the maxim, equity might have awarded relief.

27 Am.Jur.2d (Equity) § 137, at 670 (1966); *see also Deweese v. Reinhard,* 165 U.S. 386, 390, 17 S.Ct. 340, 341, 41 L.Ed. 757 (1897) ("A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."). The United States Supreme Court has emphasized that the unclean-hands defense is a narrow one, predicated upon a plaintiff's inequitable conduct which is related to matters involved in the suit. The Court explained:

> courts of equity do not make the quality of [the litigants] the test. They apply

the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.... They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice.

*Keystone Co. v. Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933) (emphasis added); *see also Codex Corp. v. Milgo Electronic Corp.,* 717 F.2d 622, 632 (1st Cir.1983), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984); *Eristavi–Tchitcherine v. Lasser,* 164 F.2d 144, 145–46 (5th Cir.1947); *Boretz v. Segar,* 124 Conn. 320, 199 A. 548 (1938); *Walsh v. Atlantic Research,* 321 Mass. 57, 71 N.E.2d 580 (1947). It is therefore incumbent upon the party asserting the defense of unclean hands not only to demonstrate the plaintiff's inequitable conduct, but also to demonstrate that the plaintiff's inequitable conduct is immediately and necessarily related to the equity that the plaintiff seeks in this litigation.[5] To ascertain who prevails with respect to the instant motion then, it is necessary to examine the plaintiff's complaint to identify the allegations upon which the plaintiff bases its prayer for equitable relief. Such an examination aids the court in determining the

---

**4.** In my earlier opinion, I applied Florida law to the unclean-hands issue because I believed that the plaintiff was seeking injunctive relief based on the common-law claims which were governed by Florida law. Upon reading the complaint again, I believe it is fair to say that the plaintiff is also pursuing injunctive relief based on Connecticut and Massachusetts consumer fraud statutes as well (*see* complaint paras. 63, 66). Of course, the principles of the equitable doctrine of "unclean hands" are extremely similar throughout the state courts. *See generally*

27 Am Jur.2d (Equity) §§ 136–44 (1966). However, where possible, I have provided citation to all three jurisdictions.

**5.** I note that the unclean-hands determination would be up to me at trial. *See, e.g., A & B Auto Salvage, Inc. v. Zoning Board of Appeals of Town of East Hartford,* 189 Conn. 573, 456 A.2d 1187, 1190 (1983); *Cain v. Cain,* 436 So.2d 367 (Fla.App. 4th Dist.1983).

nexus between the purported inequitable conduct and the instant request for equity.

■ This action is basically about the defendants' alleged falsehoods and misrepresentations to potential litigants in the *Rolo* action concerning the Florida real-estate business that GDC conducts. These untruths fall into two categories: (1) falsehoods and misrepresentations concerning the condition of certain GDC's lots in the North Port development and (2) falsehoods and misrepresentations concerning GDC's sales practices.

By far the largest amount of purported untruths specified in the complaint pertain to the condition of the GDC lot. In this regard, GDC avers that the following statements made by Mr. Binstein in a letter to GDC real-estate purchasers were untrue:

(1) "North Port lots sold by General Development have no resale value and cannot be developed in the foreseeable future, if ever" (complaint para. 13).

(2) "that was described as an 'excellent investment,' 'homesite' or 'commercial' lot, and is among the tens of thousands of such lots not improved and not located in the tiny 'core' area" (id. para. 14).

(3) "Legal actions and investigations, governmental and private, and our independent research evidence that our property is virtually worthless as an investment and will remain unimproved despite [GDC's] representations and/or guarantees to the contrary" (id. para. 15).

(4) "[a]lthough [GDC] guaranteed paved roads and drainage, [GDC] did not make such improvements [sic] and/or failed to maintain the roads and drainage canals for the limited number of lots for which it initiated such limited improvements" (id. para. 16).

(5) "As a result of [GDC's] failure to maintain roads and drainage to the limited lots [GDC] did improve, coupled with the City of North Port's refusal and inability to maintain our lots [sic], roads are so cracked, potholed and overgrown so as to be impassable and hardly recognzeable [sic], and drainage canals are so weed-filled and obliterated so as to create endless flooding" (id. para. 17).

(6) GDC "never had plans or permits to fully improve our lots and environmental and other restrictions at North Port can prevent utilities and services from ever being completed or available to our property" (id. para. 18).

(7) "[i]f paved roads ever were extended to our property as guaranteed, the City of North Port will not accept or maintain them until at least 90% of lots are improved and with houses on them. This means that, at past and current rates of growth and building demand at Port Charlotte and North Port, *we will have no roads accepted or maintained for more than 300 years.* One reason for this outrageous fact is that North Port is quite low and wet land and unsuitable for intensive development because of potential for flooding and its need for extensive drainage" (id. para. 19) (emphasis in original).

(8) "[i]n more than 20 years, [GDC] improved less than 10% of lots sold at North Port and Port Charlotte with central water and sewers" (id. para. 20).

The complaint further states that Mr. Binstein uttered falsehoods and misrepresentations at the various meetings of GDC real-estate purchasers, in particular stating that (1) GDC was guilty of fraud and RICO violations; (2) GDC has "swindled" people by selling lots as investments; (3) GDC's homesites are on unbuildable lots; (4) the City of North Port is part of the "scam;" (5) GDC never obtained any of the necessary permits and approvals from the State of Florida to develop North Port; (6) the residents of North Port are part of a conspiracy with GDC to defraud people living in the North; (7) GDC has targeted nine areas in the North within which to perpetrate "land scams;" (8) GDC has been ordered by a court not to refer to its lots as homesites; and (9) the people at GDC responsible for this "swindle" may go to jail for violating RICO (complaint para. 26).

Distilling the precedent articulated above and superimposing it on the instant procedural context, for the defendants to raise a successful unclean-hands defense, they

must demonstrate that there is no genuine dispute (1) that the plaintiff did indeed conduct itself in an inequitable manner—that is, its hands were unclean, and (2) that the plaintiff's purported inequitable conduct is immediately related to the alleged untruths and the prayer for equitable relief based on the propagation of these untruths. In deciding the prior motion for summary judgment, I concluded that the defendant could not meet this burden with respect to the first prong of this test based on the record as then constituted. Transcript of Dec. 11, 1989 proceedings, at 55–57.

In applying again for summary judgment, the defendants have brought forth many of the same evidentiary submissions that were submitted in support of their earlier application. They have submitted more affidavits, newspaper articles, and other evidence indicating generally GDC's malfeasance. They have also put forth similar types of evidentiary matter specifically indicating, (1) that GDC falsely stated that lots were excellent investments, appreciating greatly in value, when, in truth, the lots were worthless; (2) that GDC is scamming lot owners by offering to credit lot trade-ins for GDC homes at excessive values; (3) that GDC is swindling lot owners by buying their lots for $3,500 and selling to foreign investors for prices of up to $25,000; (4) that GDC is continuing to portray its lots as excellent investments that are greatly appreciating in value; (5) that GDC regularly raised selling prices of its lots to give buyers the illusion of the lot's increasing value, when, in reality, the lots were worthless; (6) that GDC failed to disclose that its lots have little or no market or resale value; (7) that GDC's program allowing a customer to trade-in a lot for the purchase of a GDC home was fraudulent; and (8) that GDC sales practices were fraudulent. Moreover, the defendants have submitted the indictment and the plea proceedings before Judge Nesbitt as evidence of GDC's unclean hands.

What the defendants have brought forth in part is evidence that GDC was generally a malefactor who should never be permitted to petition the court to use its powers in equity in favor of GDC. While these evidentiary submissions are indeed probative of GDC's iniquity in general, these evidentiary submissions are not directed to GDC's alleged inequitable conduct with respect to the condition of the GDC lots—the overwhelming part of the subject matter of GDC's complaint and prayer for equitable relief. For instance, even construing GDC's conditional guilty plea as an admission, *see, e.g., McCormick v. United States,* 539 F.Supp. 1179, 1183 (D.Colo. 1982), it does not aid the defendant's application to a great extent for the plea to count 16 of the indictment was not geared to the condition of the North Port lots. At best for the defendants, the charges in the indictment and the plea agreement admit that certain unspecified lots were undeveloped between July, 1985, and July, 1986. The charges in the indictment do not specify a larger time frame, specific location, and exactly how the lots were undeveloped. Viewed in a light most favorable to the nonmovant, as I must in this motion for summary judgment, this admission to the general factual charges in count 16, and general evidentiary submissions like it, do not have a positive impact on the defendants' unclean hands defense in this procedural context because it is clear that the relevancy of the doctrine of "unclean hands is not gauged by the personal character of the [petitioner], but by [its] conduct with reference to the subject matter, the transaction, under scrutiny." *Losey v. State ex rel. Giblin,* 158 Fla. 381, 28 So.2d 604 (1947) (emphasis added); *see also Roberts v. Roberts,* 84 So.2d 717 (Fla.1956) (the doctrine of unclean hands is not a "judicial straight jacket;" it is not that those who invoke the court's equity powers lead "blameless" lives); 27 Am.Jur.2d, *supra,* § 142, at 678 & n. 9 ("[r]elief is not to be denied because of general iniquitous conduct on the part of the complainant") (*citing Beekman v. Marsters,* 195 Mass. 205, 80 N.E. 817 (1907) *and Yale Gas Stove Co. v. Wilcox,* 64 Conn. 101, 29 A. 303 (1894)). Since much of the evidentiary material which Mr. Binstein puts forth is not sufficiently related to the factual allegations supporting the prayer for equitable relief,

it does not advance Mr. Binstein's motion for summary judgment based on the defense of unclean hands. *See also Keystone Co.*, 290 U.S. at 245, 54 S.Ct. at 147–48.[6]

Moreover, even where the evidentiary submissions do indicate that the lots and developments were in extremely poor condition (*e.g.*, Beverlin Aff. paras. 10–11, stating that, "[t]hese lots I am listing are not developed, not maintained and really not buildable," and "[m]y lot at North Port is not developed, not maintained and not buildable. The roads are crumbled and deteriorated to the point of being useless. The drainage canals have been left to fill and deteriorate to nothing. No one could build or live there"), these submissions do nothing more than contradict the earlier affirmative evidence which GDC had put forth concerning the good condition of these lots and the development. Accordingly, the issue of unclean hands with respect to the condition of the lots is still in dispute. The plaintiff's prayer for injunctive relief therefore remains viable.

I note, before concluding, that a minor portion of the plaintiff's complaint directly relates to the guilty plea—namely, claims for relief predicated on allegations that the defendants were uttering falsehoods by stating (1) that "GDC is guilty of fraud....;" and (2) that "GDC has 'swindled' people by selling lots as investments" (*see* complaint para. 26(a) & (b)). I will not, however, rule in the defendants' favor on this small aspect of the plaintiff's claim at this time because of the uncertain status of the guilty plea in the United States District Court in Florida. It may very well be that such plea will be withdrawn or modified in some respect.

In sum, the defendants' motion for summary judgment based on the doctrine of unclean hands is denied.

### D. Summary

The defendants' motion for summary judgment dismissing the New Jersey and New York consumer fraud claims (counts six, seven, and eight of the complaint) are granted. The defendants' motion for summary judgment dismissing the Connecticut and Massachusetts consumer-fraud act claims is denied. The defendants' motion for summary judgment dismissing the complaint based on the collateral-estoppel consequences of the conditional guilty plea is denied. The defendants' motion for summary judgment, dismissing the complaint based on the equitable doctrine of unclean hands is denied.

### 2. Rule 41(a) Dismissal

The plaintiff has moved the court for a Fed.R.Civ.P. 41 dismissal without prejudice. On the other hand, the defendants have moved for a Fed.R.Civ.P. 41 dismissal with prejudice. Since I believe that I have already taken care of the defendants' substantive arguments with respect to their application for dismissal with prejudice above, I will focus on the plaintiff's application now as it bears on the counts of the complaint that remain.

The plaintiff has petitioned the court for a Rule 41(a)(2) dismissal without prejudice. The plaintiff submits that it is not seeking

---

**6.** The plaintiff also contends in its papers that since the defendants have made no showing that his own rights were prejudicially affected by the plaintiff's conduct, they cannot be heard to complain of the plaintiff's unclean hands. In support of this proposition, the plaintiff quotes a passage from a Florida appellate court decision, *Pennington v. Pennington,* stating: " 'the conduct constituting the unclean hands must be connected with the matter in litigation and *must affect the adverse party.*' " Plaintiff's Opposition Brief, at 10–11 (*quoting* 390 So.2d 809, 810 (Fla.App. 1980) (emphasized in brief). However, in so quoting from this case, the plaintiff omitted the first word of that sentence, "Generally." Id. *Pennington* therefore realizes that there will be exceptions to the usual rule. I believe that an exception to the usual requirement of adverse-effect should be made here, where the plaintiff is suing defendants who are pressing the cause of the plaintiff's adversaries in another action as the adversaries' agents and where those two actions are related. The courts would support such exceptions to the *Pennington's* general rule. *E.g., Faber v. Landman,* 123 So.2d 405 (Fla.App. 2d Dist.) ("there is no bar to apply the [unclean hands] doctrine in a case in which the plaintiff and defendant are both parties to a fraudulent transaction or *where the fraud is perpetrated on a third party*" (emphasis added)), *cert. denied,* 125 So.2d 878 (1960).

this dismissal for any tactical advantage or improper purpose. It submits that the continued prosecution would be a drain on its resources and that it does not want to continue this litigation because the announced plea of guilty would likely make it "difficult, although not impossible" for GDC to prove damages in this action. For their part, in addition to the arguments above regarding dealing with the complaint on its merits, the defendants have asked me to order the complaint dismissed without prejudice conditioned upon the payment of costs, expenses, and legal fees to the defendants. The defendants further submit that, on account of this dismissal without prejudice, are "prevailing parties" entitled to fees and costs.

Fed.R.Civ.P. 41(a) states:

(A) Voluntary Dismissal: Effect Thereof

(1) By Plaintiff; by stipulation. Subject to the provisions of Rule 23(e), Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of the court (i) by filing a notice of dismissal at any time before service by the adversary party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

(2) By Order of Court. Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

According to the United States Court of Appeals for the Fifth Circuit, "[w]ithin this rule there are three separate and distinct methods of voluntarily dismissing a suit. The first and second methods are covered by Rule 41(a)(1) which provides for a dismissal by notice, and dismissal by stipulation of the parties. The third method is found in Rule 41(a)(2) which provides for a dismissal by order of court upon such condition as the court considers just." *American Cyanimid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir.1963). My focus in this case is upon the third method.

Preliminarily, there has been some suggestion by the defendants that I have the right to dismiss this matter with prejudice, without an adjudication of the merits of the plaintiff's claims. The plaintiff, however, has not sought a dismissal with prejudice; rather it has asked for a voluntary dismissal without prejudice. Thus, the defendants are asking me to impose more onerous conditions on the plaintiff than the plaintiff would want. As Professors Wright and Miller quite logically stated, "[d]ismissal would not be voluntary if more onerous conditions were imposed." 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2366, at 176–77 & n. 6 (1971) (*citing Federal Sav. & Loan Ins. Corp. v. First Nat'l Bank, Liberty, Mo.*, 4 F.R.D. 313 (D.Mo.1945), *mandamus denied*, 148 F.2d 731 (8th Cir.1945)). In reality, what the defendants are asking for is involuntary dismissal/summary judgment. I have already treated their arguments in this regard.

A motion for dismissal without prejudice based on Fed.R.Civ.P. 41(a)(2) lies within my discretion. *See Johnston Development Group, Inc. v. Carpenters Local Union No. 1578*, 728 F.Supp. 1142, 1146 (D.N.J.1990) (Brotman, J.); *Citizens Savings Assoc. v. Franciscus*, 120 F.R.D. 22, 24 (M.D.Pa.1988) (Nealon, C.J.) (*citing Ferguson v. Eakle*, 492 F.2d 26, 28 (3d Cir. 1974)). Generally, such dismissal should be

allowed unless the defendants would suffer some prejudice from the dismissal. 120 F.R.D. at 24. The prejudice must be substantial, *see, e.g., Johnston Development Group Inc.,* 728 F.Supp. at 1146; " '[t]he prospect of a subsequent lawsuit is not sufficient to deny a motion without prejudice.' " Id. at 24 (*quoting Shulley v. Mileur,* 115 F.R.D. 50, 52 (M.D.Pa.1987)).

I perceive no substantial prejudice to the defendants at this time for a few reasons. First, the dismissal will allow at least one of the defendants, Mr. Binstein, to focus his energy on the *Rolo* action; even though that action has been stayed at this time, naturally there would still be many administrative and out-of-court matters that need be dealt with in supervising an action involving over 3,000 plaintiffs. As for Mr. Joel, he will be let alone since it appears that his involvement with *Rolo* is coming to an end because he is withdrawing as counsel. Second, the defendants' counterclaims have been stayed by the bankruptcy proceeding, so the dismissal of this action does not affect those claims—a typical concern of the court in deciding a motion for a voluntary dismissal without prejudice. *See* Fed.R.Civ.P. 41(a)(2). Third, while the defendants, and to a lesser extent the plaintiff, have been liberal in conducting motion practice before this court, it appears that little discovery has been conducted in this action. *See Citizens Savings Assoc.,* 120 F.R.D. at 25 (extent of discovery a factor in assessing efficacy of Rule 41(a)(2) motion). Since this litigation is still at a fairly early stage, that too favors the plaintiff's application. Fourth, and last, mindful that the prospect of a subsequent lawsuit is not enough to deny the motion, I believe that it is even less of a reason here because the plaintiff, itself, has conceded the now-precarious quality of its damages case in this action and, implicitly, that the risk of nonrecovery far outweighs the benefit of recovery. Hence, it is unlikely that this action would be brought again. Accordingly, finding no substantial prejudice to the defendants, I will grant the plaintiff's application to dismiss what remains of the complaint without prejudice.

The defendants have raised the question of whether I should condition such dismissal on the payment of costs and attorney's fees. Another district court in this circuit has explained the shifting of costs and fees in this context, stating,

[t]he imposition of costs is not always a prerequisite for a voluntary dismissal without prejudice, although it is often necessary for the protection of the defendant, and the decision whether or not to impose costs and attorney's fees upon the plaintiff is within the discretion of the court. *Puerto Rico Maritime Shipping Authority v. Leith,* 668 F.2d 46, 51 (1st Cir.1981). "Awarding attorney's fees as a condition to voluntary dismissal without prejudice is very common." *Shulley,* 115 F.R.D. at 52 (citing *Pittsburgh Jaycees v. United States Jaycees,* 89 F.R.D. 454 (W.D.Pa.1981)). "The purpose of the awards [of costs and attorney's fees as a condition for dismissal . . . is to compensate the defendant for having incurred the expense of trial preparation without the benefit of a final determination of the controversy." *Shulley,* 115 F.R.D. at 52 (quoting *John Evans Son, Inc.,* 95 F.R.D. at 191). "While costs are not always required as a condition for a voluntary dismissal, it is usually considered necessary for the protection of the defendant." *Peifer v. Royal Bank of Canada, supra,* 121 F.R.D. at 41. . . .

*Citizens Savings Ass'n,* 120 F.R.D. at 22–23. A different court further has stated that attorney's fees should not be awarded (1) where the defendant will not be prejudiced if the court does not impose the condition of payment of attorney's fees and (2) the plaintiff has dismissed the complaint in good faith. *Davis v. USX Corp.,* 819 F.2d 1270, 1276 (4th Cir.1987) (affirming award of costs, but not fees); *but see Taragan v. Eli Lilly and Company, Inc.,* 838 F.2d 1337, 1340 (D.C.Cir.1988) (good faith is irrelevant to award of fees).

From the plain language of its supplemental memorandum with regard to the court's authority to dismiss with prejudice, the plaintiff has challenged the condition of

an award of attorney's fees and, apparently, although it is not entirely clear, has also challenged the condition of an award· of costs. The plaintiff asserts that it has not dismissed for an improper purpose (i.e., to avoid the collateral-estoppel consequences of the guilty plea); that attorney's fees, if any, should be limited to court appearances prior to dismissal; that the defendants (who proceeded pro se for much of this litigation) should not receive fees for the work that they, themselves, did; and that, if the court wishes to impose a condition, then the better course would be to impose such condition upon the event of GDC reinstituting this action. With regard to this last assertion, GDC explains that "[b]y waiting until a new action is brought (if one is ever brought), the court can deal with the question on the basis of concrete claims, concrete costs and a fully developed record." Plaintiff's supplemental memorandum with regard to the court's authority to dismiss with prejudice, at 8.

Since the award of costs is usually given in this context, *see, e.g.*, 9 C. Wright & A. Miller, *supra*, § 2366, at 177 & n. 11 (the court "should at least require that the plaintiff pay the costs of litigation") (and cases cited therein), I will condition the dismissal on the plaintiff paying the defendants' costs as provided by statute and this court's General Rule 23. I do so to compensate the defendants for having to prepare this case, and not getting the benefit of a final determination. Moreover, I do so because the posture of this action, if ever brought again, may change considerably, depending on the events in the Florida courts, and may require the defendants to take new tacks in opposing the plaintiff in the future, thus devaluing the future worth of the preparation that they have done now.

I will not award attorneys fees as a condition of dismissal. I do not believe that the dismissal was taken in bad faith. Moreover, I do not believe that the defendants will be severely prejudiced monetarily by nonimposition of this condition because neither defendant has retained counsel for that long—Mr. Joel's counsel apparently having been retained on or around

March, 1990 and Mr. Binstein apparently having retained counsel on or around June 29, 1990. Let me also note that these able counsels' work product before this court has been minimal, consisting mostly of short letter briefs which did not contain a significant amount of authority. Also, they have only appeared before me on two occasions at most. Last, assuming for the moment that the plaintiff brought this matter in good faith and was not unreasonable in doing so (a question I will answer in more detail later), it would be unfair of me to award attorney's fees for dismissing a litigation without prejudice, where I normally could not award attorney's fees if the matter was dismissed with prejudice. *See* 9 C. Wright & A. Miller, *supra*, § 2366, at 179–80 (pointing out this anomaly). Accordingly, I will not condition the dismissal on an award of attorney's fees as the defendants request.

In sum, the plaintiff's motion to dismiss what remains of the complaint without prejudice is granted. Such dismissal without prejudice shall be conditioned on the prompt payment of costs to the defendants. The defendants' motion to dismiss the remainder of the complaint with prejudice is denied. The defendants' application to condition the dismissal without prejudice upon the plaintiff's payment of the defendants' attorney's fees and expenses other than costs is denied.

### 3. Sanctions

 Both the plaintiff and the defendants have, in the past few months, applied for sanctions including attorney's fees, from their adversaries. I have jurisdiction to consider these matters of sanction even after accepting the plaintiff's voluntary dismissal without prejudice as to what remained in the complaint. *See Schering Corp. v. Vitarine Pharmaceuticals, Inc.*, 889 F.2d 490, 494–95 (3d Cir.1989).

### A. The Plaintiff's Application

 The plaintiff has moved for an order compelling Mr. Binstein to appear for a deposition and for sanctions for his fail-

ure to appear and for sanctions for Mr. Binstein's filing of, according to the plaintiff, frivolous motions. As an initial matter, the motion to compel discovery will be denied as moot in light of the disposition of this litigation and the fact that two days of questioning were conducted in March, 1990. As for the motions for sanctions: (1) the request for sanctions based on frivolous filing is denied because, as indicated above, there was some merit to the defendants' (including Mr. Binstein's motions)—in fact, even where his motions were denied, they were not frivolous applications which the court could dismiss out of hand, but were instead based on a plausible legal argument; and (2) the request for sanctions for Mr. Binstein's failure to appear for his deposition is denied because Mr. Binstein is a pro se litigant; he should be given a warning from this court before sanctions are imposed for failure to appear. Let me take this time to warn Mr. Binstein, that unless he obtains leave of court relieving him from an obligation, I urge him in the strongest terms to take seriously his obligations as a litigant to appear when requested, or to be willing to suffer the consequences of nonadherence.

### B. The Defendants' Application

■ The defendants' application for sanctions is a bit more involved than the plaintiff's application. Frankly, it is more involved because, facially, it has more merit. The defendants basically state that GDC's counsel, Cravath, Swaine & Moore and Davis, Markel & Edwards, did not properly investigate this litigation before filing this action. The defendants further argue that throughout this litigation these firms have failed to adhere to the requirements of Rule 11 basically by (1) continuing to press an insupportable action despite mounting evidence that the action has no basis; and (2) by filing papers with the court that are disingenuous. The defendants assert that the plaintiff's complaint is nothing more than a "strike" suit brought in an attempt to throw the defendants off GDC's trail in the *Rolo* litigation. In other words, as one attorney in this action has put it, this action is a preemptive bombard-

ment to keep the defendants in their foxholes and prevent them from mounting an efficient attack on GDC in the *Rolo* action. Normally, a district court in this day and age, where Rule 11 applications are almost obligatory, would not pay a large degree of attention to such allegations without something more from the proponent. But, here, Judge Broderick sounded the "red alert" where he stated much earlier in this litigation that this suit appeared to be a "preemptive strike."

The plaintiff, and their many counsel, have argued that they have done nothing that is in violation of the rules or that is sanctionable. In a nutshell, they state that their conduct and the product that was produced based on this conduct is well grounded in fact and law with respect to actions prior to the filing of the complaint and also with respect to the actions that they have taken after the filing of the complaint.

The question of sanctions in this action is based on three separate sources: Fed.R. Civ.P. 11, 28 U.S.C. § 1927, and the court's inherent power. Since Rule 11 applies the least tolerant standard for examining the plaintiff's and their counsels' actions in conducting this litigation, *compare* Fed.R. Civ. 11; *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir.1987) (Rule 11; unreasonableness) *with Baker Indus. v. Cerberus Ltd.*, 764 F.2d 204, 208–09 (3d Cir.1985) (Garth, J.) (Section 1927, bad faith) *with Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 565 (3d Cir.1985) (bad faith/willfulness), I will apply Rule 11 standards here. If, on the one hand, the plaintiff and its counsel have failed to adhere to those standards, then their conduct is sanctionable and there is no need to go further. If, on the other hand, I conclude that the plaintiff and counsel have adhered to those standards, then they cannot possibly be guilty of more serious violations of bad faith and willfulness. Moreover, Rule 11 is the most appropriate rule to utilize in this instance because the problems giving rise to the questions of sanctions can all be linked to actions involving the signing of

**1142**　　■■■■■

court papers. *See Gaiardo*, 835 F.2d at 484.

■■ Federal Rule of Civil Procedure 11 provides for sanctions, including attorney's fees, against parties who file papers which lack an objectively reasonable basis in fact, or which lack both an objectively reasonable basis in law and a good-faith argument for a change of law, or which are interposed for an improper purpose, such as harassment, needless delay, or undue expense. See *Lieb v. Topstone Indus.*, 788 F.2d 151, 157–58 (3d Cir.1986). The United States Court of Appeals for the Third Circuit has expressly stated on more than one occasion that "rule 11 is not [to] be used routinely when the parties disagree about the correct resolution of a matter in litigation. Rule 11 is instead reserved for only exceptional circumstances." *Morristown Daily Record, Inc. v. Graphic Communications, Local 8N*, 832 F.2d 31, 32 n. 1 (3d Cir.1987); *accord Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99 (3d Cir.1988); *Gaiardo*, 835 F.2d at 483. It is not a fee-shifting law. Id. The standard for assessing the propriety of sanctions is one of reasonableness. As the Third Circuit explained,

> [t]he rule requires a reasonable inquiry into both the facts and the law supporting a particular pleading. We have stressed in two recent cases that proper analysis should focus on the circumstances that existed at the time counsel filed the challenged paper. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir.1988); *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484 (3d Cir.1987). The wisdom of hindsight is to be avoided; the attorney's conduct must be judged by what was reasonable to believe at the time the pleading, motion, or other paper was submitted.

*Schering Corp.*, 889 F.2d at 496 (emphasis added).

The plaintiff's and its counsels' conduct can be broken down into two cells (1) conduct precedent to the filing of the complaint and (2) conduct during the litigation with respect to the filing of its papers in this matter.

With respect to the former cell, I find nothing "sanctionable" in the plaintiff's and their counsels' conduct in bringing this action. Mr. Edwards swore in his affidavit to this court:

> I was the principal draftsman of the complaint and was one of the attorney's responsible for the prosecution of this action after the complaint was filed. This action was undertaken in good faith and was not designed to harass, cause unnecessary delay or needlessly increase the cost of litigation to the defendants. Moreover, except to the extent that defendants have been required to defend against meritorious claims (as is the case in any lawsuit), this suit litigation has not had *the effect* of harassing, causing unnecessary delay or needlessly increasing the cost of litigation to defendants.

(Edwards June 18, 1990 Aff. ¶ 2). Mr. Edwards further indicated that he and others extensively reviewed the law and facts in this case before filing this complaint; that the grand-jury matter proceeding at that time against GDC concerned a very different matter than the subject of the complaint—referring to GDC's relationship with secondary lenders and not germane to the alleged falsehoods regarding the conditions of the lots; and that GDC authorized him to file suit (*e.g.*, id ¶ 15). The defendants have argued that this was not enough, that the earlier grand-jury investigation and the allegedly poor condition of the lots themselves (which GDC's counsel should have known from its investigation) indicate that the plaintiff and its counsel could not have reasonably brought this action. I cannot agree with the defendants. From the record before me now, it does appear that while generally related, that grand-jury investigation did not deal with the subject-matter of the complaint—the condition of the lots. Further, the defendants' argument with respect to investigating the lots presupposes that the lots were in poor condition—a question that only trial on the merits could answer. Accordingly, there is no merit to the defendants' application for sanctions based on the purportedly

inadequate investigation of the facts underlying the complaint.

 The defendants also appear to state that sanctions should issue because it became more and more apparent as the litigation progressed that the action was frivolous based on the investigation leading to the March, 1990 indictment, the return of the indictment itself, and the conditional plea of guilty by GDC. I disagree. First, few of the new facts from the intervening events bore on the specific allegations of inadequate status of the lot developments—the predicate of the instant complaint. Hence, GDC and its counsel were not presented with a *fait accompli* by these events. Second, in this circuit, there appears to be no Rule 11 duty to amend earlier filed papers to reflect late-breaking events. As the United States Court of Appeals for the Third Circuit stated:

> By its terms, Rule 11 does not authorize a sanction for failing to amend or correct a document if information obtained or legal research performed after filing reveals an error. Cases which impose a continuing duty on counsel to make amendments based on knowledge ascertained after filing are not consistent with the rule.... The analysis properly concentrates on circumstances existing at the time the paper was filed.
>
> Notwithstanding the emphasis on the time of the initial submission, however, parties will not be entitled to continuing immunity if they acquire knowledge under the Rule's standard before a later filing. Subsequent papers must be judged by information available when they are filed.

*Gaiardo*, 835 F.2d at 484. Restated, there is a duty to tell the court the true status of the action when corresponding with the court. Initially, I was concerned that attorneys from Davis, Markel & Edwards had not adhered to that duty when they informed the court in a brief filed on March 12, 1990 that "we are unaware of any Florida court ever holding that GDC defrauded any customer by failing to disclose that its prices are higher than those found elsewhere," and then a few days later GDC agrees to plead guilty in a Florida court.

However, in light of Mr. Edwards' representation to the court that GDC had not decided to plead guilty until the very last minute (*see, e.g.,* Transcript of June 29, 1990 proceedings, at 120–21)—a representation that I have no reason to doubt as it is made in his posture as an officer of the court, I am now satisfied that GDC and its counsel did not violate Rule 11 in this regard. In their next submission to the court, before the April 9, 1990 argument, received by me on April 5, 1990, they updated the court as to the indictment and plea—exactly what is required of them under Rule 11.

I would be remiss in my role as a judge, however, to not add further commentary. Though it is clear that GDC and its counsel did what was required of them under the law, I am afraid that they fell woefully short in providing the court with the common courtesy of keeping me apprised of late-breaking developments in this action. Two whole weeks passed before the court heard word one from them concerning the conditional plea. More is expected from Cravath Swaine & Moore; Davis, Markel & Edwards; and their local counsel, Sills Cummis Zuckerman Radin Tischman Epstein & Gross.

Let me also advise these counsel that while the court appreciates attorneys who can narrow issues for the court, it does not appreciate receiving incomplete supporting documents from counsel. Counsel should have furnished this court immediately with a full copy of the transcript of the March 22, 1990 proceeding before Judge Nesbitt, instead of only selected pages. Since, however, I have no proof positive that this oversight was conducted in bad faith (because the missing pages do not aid the defendants' case), this admonition is sufficient.

Accordingly, since I do not conclude that the plaintiff and counsel were unreasonable in their filing of papers in connection with this litigation and since there is nothing presented which reasonably indicates bad faith and since there are no exceptional circumstances warranting sanctions under the law as defined by the United States

Court of Appeals for the Third Circuit, I will deny the defendants' motion for sanctions.

CONCLUSION

The defendants' motion for summary judgment, dismissing the counts of the plaintiff's complaint based on the New Jersey and New York consumer-fraud acts is granted. The defendants' motion for summary judgment, dismissing the counts in the plaintiff's complaint based on the Connecticut and Massachusetts consumer-fraud acts is denied. The defendants' motion for summary judgment dismissing the complaint based on the collateral-estoppel consequences of the conditional guilty plea is denied. The defendants' motion for summary judgment dismissing the complaint based on the doctrine of "unclean hands" is denied. The plaintiff's motion to dismiss the remainder of the complaint without prejudice is granted conditioned upon the plaintiff's payment of costs to the defendants—costs as dictated by statute and General Rule 23 of this court's General Rules. The defendants' motion to dismiss the remainder of the complaint with prejudice is denied. The defendants' application to condition the dismissal with prejudice upon the award of attorney's fees and expenses other than costs from the plaintiff to the defendants is denied. The plaintiff's motion to compel discovery is denied as moot. The plaintiff's motion for sanctions is denied. The defendants' motion for sanctions is denied. The court has signed an order. The court, as a courtesy, will send copies of this opinion to Judge Nesbitt of the United States District Court and to Judge Cristol of the United States Bankruptcy Court.